for any keeper of a public house of entertainment, tavern, inn, ale-house, ordinary or victualling house, to sell any spirituous or intoxicating liquor as a drink, or any other kind of liquor or beverage usually sold at a tavern bar, on the Lord's day; and such sale shall be considered as a worldly employment or business," under the penalties of the act of 1795.]

—»>>🟊🟊🟊<<«—

## THE STATE *vs.* GEORGE PLATT.

## THE STATE *vs.* JAMES ROGERS.

The persons appointed by an act of the legislature as managers to conduct and execute a lottery grant for the benefit of a college, &c., are not entitled to *compensation for services*, there being no such provision in the law, although they were required to enter into bonds and render important service from which the State derived a benefit.

Such persons are not *public officers*, but *trustees;* and the acceptance of the trust being *voluntary*, the execution of it is no ground of legal claim for compensation.

A voluntary trustee is not entitled to *compensation* other than that stipulated for, though he is entitled to be reimbursed his *expenses*, the distinction between which is well established.

[*Note.* The Chief Justice did not sit because of his connection as brother-in-law of the defendant in the second cause.]

These suits were docketted by an arrangement between the defendants and attorney general, to try the question of the defendants' right to retain as a compensation for their services, a balance in their hands of a fund received for the State and Delaware college.

By an act of the legislature passed February 11, 1835, James R. Black, James Rogers, Andrew Gray, George Platt and Henry Whiteley, were appointed managers of a lottery for the benefit of Delaware College and other purposes, with power to institute, carry on and draw a lottery in one or more classes, for raising a sum not exceeding one hundred thousand dollars clear of all expenses. They were required to give separate bonds for the faithful discharge of the trusts reposed in them, and to take an oath faithfully to perform them. They were authorized to proceed to draw the lottery themselves; to appoint commissioners to attend the drawing; and, if they thought proper, to sell the scheme, or any class of the lottery, provided they took sufficient bonds and security from the vendees, in which case they were to be exonerated from all liability on account of such persons as they might sell to. The grant was limited to ten

years. The managers were all trustees of Delaware College. Mr. Gray did not act; the others gave bond, and in April, 1835, sold the entire scheme to Yates & McIntyre and D. S. Gregory & Co., of New York, for one hundred thousand dollars clear of all expenses, payable ten thousand dollars each year, with the right of terminating the contract at six months' notice. The vendees gave bond and security. The proceeds of this contract were paid quarterly to Mr. Black, one of the managers, he being also treasurer of the college. After his death, in September, 1839, the managers permitted the treasurer of the college who succeeded him to receive that portion which belonged to the college, directly from the contractors; and the balance, belonging to the school fund and State, they allowed for about one year to accumulate in the contractors' hands, when it was, by their consent, paid over directly to the State treasurer. The amount received from the contractors and paid to the college and State treasury was sixty-six thousand, nine hundred and forty-one dollars, and seventy-nine cents. In consequence of notice from Gregory & Co., closing the old contract, a new one was made with them in April, 1840, very much reducing the sum to be paid by them annually. On the 6th of April, 1842, the managers had in hand the sum of two thousand and fifty dollars, and they subsequently received three thousand, three hundred and fifty dollars. On that day they met and determined upon a compensation of two hundred dollars per annum each, " for services, &c., connected with the management;" and they apportioned the sum in hand in equitable proportions, as they judged, among themselves and the representatives of the deceased managers, Judge Black and Col. Whiteley having died, and their places being supplied respectively by Thomas M. Rodney and John Evans Young, by appointment from the governor.

The declaration was in debt on the defendants' bond as managers of the lottery, reciting all the material facts and assigning as a breach the receipt and non-payment to the college and State of a sum sufficient to cover the balance in the managers' hands. The defendants traversed all the material allegations in the narr., and pleaded several pleas to the breach, the most material of which was, " 4th, a set off for services and compensation as managers of said lottery."

The questions therefore were:—

1. Whether the defendants' were entitled to retain the fund in hand as a compensation for their services as managers of the lottery. *

2. If they were entitled to compensation, what should be the amount thereof; and this the parties agreed should be settled by the judges.

*Ridgely,* for the State.—1. Are the managers under the lottery act of February, 1835, entitled to any compensation? The main object of the act was to raise $100,000 *clear of all expenses in ten years.* Immediately after the passing of the law, the managers *sold* the grant for $100,000 *clear of all deductions and expenses,* payable at certain times within the ten years. The managers then, as soon as their agency commenced, determined against running any risk of drawing the lottery, and sold it with an express provision that the vendees should pay the whole amount clear of all deductions and expenses. If they had then had any idea of compensation provision would have been made for it. *The act* does not directly or indirectly provide for compensation. Such compensation cannot come *out of the fund,* for the contract was to pay the full amount authorized, clear of all deductions, *for the benefit of the college and school fund.* The trustees or managers, under the law, have no right to any compensation unless the act expressly gives it to them. They were trustees of the college and the object was to aid that college; they were acting for themselves and could not be entitled to compensation.

The trust was voluntarily accepted, and must be taken on its own terms; they were not bound to serve; but having served voluntarily, they served gratuitously, unless the law provides otherwise.

Trustees are not allowed any compensation unless stipulated for. This applies not only to trustees, strictly, but to all who are invested with a fiduciary character. (8 *Del. Laws* 355; 24 *Law Lib.* 222; *Lewen on Trusts* 438; 2 *Atky. Rep.* 400; 1 *Johns. Ch. Rep.* 25, *Green* vs. *Winter; Ibid.* 527 *Manning* vs. *Ex's. of Manning;* 1 *Ball. & Beatty Ch. Rep.* 189; 3 *P. Wms.* 251; 3 *Harr. Rep.* 110, *Egbert* vs. *Brooks.*) Independently of the general right of the managers to compensation, the question submitted is whether they have a right to *retain* this compensation out of the sum raised under the lottery, for the objects of the lottery; and which was to be a *clear* fund. The managers having raised that fund, might have come to the bounty of the State for compensation; or for leave to draw further for their own compensation, which was Judge Black's idea; but here they claim to stop a part of the college fund for their own compensation. These trustees were bound to pay it all over according to the trust, and ought to have gone to the legislature for compensation.

2. As to the amount of compensation, if any shall be lawfully recoverable, the parties agree to submit this matter to the court. These managers had to make the contracts; to go to Philadelphia, occasionally; to make drafts and take receipts. The necessary expenses incident to this were a part of the expenses stipulated to be paid by the contractors.

*Wales* and *Rogers*, for defendants.—It is conceded that the expenses of the managers were to be paid; but it is alledged that these expenses were payable under the contract by the contractors. The sum stated in the lottery grant was merely a limit, and no matter of obligation under the contract. It was a grant to the managers or agents of the State to raise by the lottery a sum not exceeding $100,000. In making a contract with Gregory & Co., these agents were careful to make them stipulate to pay so much per annum and all " expenses attending the instituting, carrying on, and drawing the lottery." These were the expenses of the contractors, and not the expenses of the managers. It is impossible that this covenant of the contractors can be made to cover the expenses of the managers. The stipulation was for expenses connected with drawing the lottery; expenses which would have fallen on the managers if they had themselves undertaken to carry on and draw it. Having the right to contract with Gregory & Co. for a gross sum beyond expenses, they had the power to include their own compensation as expenses; and the sum beyond both expenses and compensation, was the only sum to be paid over as the nett proceeds of the lottery. Admit that the managers had the power to discriminate between the nett fund and the expenses, the right to deduct compensation as a part of the expenses follows.

It is argued that they are not entitled to compensation because the act does not expressly give it to them. It does not give any compensation to the lottery commissioners, and yet there is no question about their right to compensation. There was no connection between these defendants as trustees of the college and managers of the lottery. The identity was merely accidental. The college was entitled to only a share of the proceeds. The governor was authorized to fill vacancies without any reference to their being trustees of the college. The construction of this act as to compensation is to be made not only on the terms of the act, but in reference to the existing law of the land. These managers were to come under heavy obligations by bond, by oath of office, by extensive and complicated duties running through ten years,—is it likely

that this obligation should have been imposed or taken without any idea of compensation? Whatever is necessarily implied in a law is as much the law as if embodied in express terms. The object of the act was to raise money for the benefit, not merely of the college, but of the State. It was to raise funds for the State. The grant is unlimited, except as to amount and time. Every power necessary for carrying it into execution was given. It was a grant to the managers *as agents of the State,* acting under oath and bond, of full power to raise a sum not exceeding $100,000, and all expenses besides. The act contemplated that the managers should themselves proceed to institute, carry on, and draw the lottery, pay prize tickets, appoint agents to sell, and commissioners to draw, &c.

The managers were not only authorized but required by section 2, to appoint three commissioners to attend drawings of the lottery. Were these to have no compensation? None is expressly given by the act, yet its objects could not be carried out without their appointment, and this could not be done without paying them. And if the compensation of commissioners appointed by the managers is necessarily embraced in the law, much more is the compensation of the managers. If the money which would have been made by drawing the lottery would have been subject to these deductions for expenses and compensation, the fund arising from a sale of the scheme must equally be subject to such deductions. *Expenses* meant not merely the payment of money, but every thing which might be necessary to carry out the objects of the act.

The managers have been called " *trustees,*" and they were so in the same sense that every other public officer is a trustee; but they were *more* than trustees, they were managers ; agents of the State, performing service *for* the State ; and from which service the State derived benefit. The English doctrine as to trustees not being entitled to compensation, is not the law of our State, except in the case of a purely voluntary trustee. In this country the great principle is, that he who bestows his labor for another, is entitled to adequate compensation, whatever may be the character in which he is employed. The English doctrine was founded on the policy of the times when the church had nearly engulphed all the property of the kingdom in the hands of trustees. This policy never extended to this country ; and at best, policy is a bad ground of legal judgment. (3 *Harr. Rep.* 219, *Bayard* vs. *McLane.*) In most if not all the States, this English doctrine is repudiated,—in Pennsylvania expressly. (1 *Baldw. Rep.* 163.) In New York, though formerly followed, as

in the case cited from 1 *Johns. Rep.* 25, 37, it is now otherwise. In Delaware all trustees are entitled to compensation—executors, administrators, guardians, assignees of insolvents, trustees appointed by the Orphans' Court and Court of Chancery to sell land or perform other duty. If the principle be admitted, it is equally operative when the compensation is implied as if expressed. Whenever the right to compensation or expenses exists, it is implied without any express provision. (10 *Law Lib.* 69, *Willis on Trustees* 147; 24 *Law Lib.* 224, *Lewen on Trusts;* 8 *Vesey Rep.* 8 ; 18 *Ibid.* 253.)

The case of Egbert and Brooks does not controvert this. The trust was there accepted without any intention to charge compensation, and the trustee had been guilty of a breach of trust, which is a forfeiture of compensation. It was also the decision of a court of equity under the peculiar doctrines of equity, and is not applicable to a court of law ; and it was purely a voluntary trust.

In all cases of service to the State, the legislature has uniformly recognized the right of compensation ; even in cases of lottery grants. (2 *Del. Laws* 1189 ; 8 *Ibid* 362 ; 9 *Ibid* 539, 546.) The principle of the constitution that no man's property shall be taken for the use of the State, without compensation, applies equally to individual services rendered under the requirements of an act of assembly. The act is a contract with the managers, (*Dart. Col. case,* 4 *Wheat. R.*) and the bond of the managers is without consideration, unless a consideration arises from the right to compensation. Where services are rendered for the State by direction or request of any branch of the government, there is a *legal* right to compensation, though nothing be expressly stipulated for. (7 *Peters' Rep.* 1, *U. S.* vs. *McDaniel; Ibid* 18, *U. S.* vs. *Ripley ; Ibid U. S.* vs. *Fillebrown ;* 15 *Ibid* 336, *Gratiot* vs. *U. S.*)

2. As to the amount of compensation. It must be estimated by the nature of the service ; the character of the agents, and the whole circumstances. The ordinary commission on the receipt and payment over of money is five per cent. ; which would be a sum much greater than is charged or claimed here.

*Gilpin*, Attorney General, in reply.—The question for me to argue is not how much these defendants *deserved* for their management of this lottery. If they have rendered to the public important services gratuitously, they have their reward from public approbation ; if they rendered these services for the benefit of the college with which they are connected as trustees, they must look to that institution for compensation, if any other be claimed than its ap-

proval; if they claim other than honorary rewards from the public, they should lay their case before the legislature. The question before this court is, whether they have any *legal right* to *retain* compensation for their services out of the fund entrusted to them for other purposes. Does the law provide for this?

What is the history of this law? In 1833, the Delaware College was incorporated by the legislature, on the recommendation of governor Bennett, whose secretary of State, the defendant, James Rogers was. He and the other defendant, Platt, were trustees of that college. In 1835, this lottery act was passed for the benefit of the college, of which these managers were all trustees. It was a grant to the defendants *for their own benefit,* they being members of the corporation. The State made to them a donation of $50,000, and now they ask compensation for receiving the gift. Can it be possible that these gentlemen in accepting, or the State in making, this grant for the benefit of the college which they represented, contemplated that compensation was to be made to the trustees for the services necessary to realise the benefits of the grant.

The contract which they immediately after made with Yates & McIntyre and D. S. Gregory & Co., proves the same thing; for, having the power to raise the nett sum of $100,000, for the college and other purposes, they contracted with the managers for just that sum, over and above *all expenses.* The term "expenses" used in the law, is used in the contract; so that if the expenses in the act is broad enough to cover a claim for compensation, it is equally broad in the contract, and is to be paid by the contractors. But the term expenses means no such thing. It means expenditures, and not pay for personal service. Expenses, charges, costs, disbursements, indemnity, allowances, are all synonymous when applied to trusts; and mean a restoration of that which has been paid, laid out or expended. (24 *Law Lib.* 229.)

It is obvious that the defendants did not consider themselves entitled to compensation *out of the fund.* They were authorized to raise $100,000, clear of all expenses, *for the college,* &c. They sold the grant for that sum clear of all expenses, thus "raising" the full amount authorized by the grant, clear of all expenses. Who was entitled to this? the beneficiaries under the law; the college, &c. Every dollar of it belonged to them, and these trustees were bound to pay it over—all of it, in the performance of their duty. The act says that all the money raised under the grant, after deducting expenses, shall be applied to the college, &c. If this money was the

fund raised under the grant it was specifically granted, and the managers had no right to divert it from the objects of its appropriation.

Even if the managers were entitled to compensation, it could not be out of the fund thus specifically appropriated, but must have been by extension of the grant, or by donation from the legislature out of the State funds. And this seems to have been the idea of Judge Black; who, according to the testimony, spoke of drawing on for compensation. None of them ever intended or supposed that compensation was to be deducted from the fund paid by the contractors.

. There being no right to compensation to be implied from the law, is there any on equitable grounds out of the act? Take the case of public officers, which these have been likened to. Suppose an officer appointed by law to do any duty, and there be no compensation provided, if the officer accept the office and do the duty, he can recover no compensation; much less retain public money in his hands. If he so accept office, his only remedy for compensation is by petition to the legislature. But these are not public officers or agents; their true character is that of *trustees;* appointed to execute a trust in behalf of others; giving bond to execute their "trust;" taking an oath to perform the trust. And the principle is with regard to all such trustees, that they are entitled to no compensation, only the reimbursement of "*expenses.*" But they say these defendants are divested of the character of trustees, and taken out of the principle in relation to compensation, by giving bond and taking oath. I deny it, and maintain that the only test is, whether they *voluntarily* accepted this trust without stipulation for compensation, or was it thrust upon them. A man makes his will and makes me his executor, with directions that I shall give a bond and take an oath, and with duties in reference to his estate which would take all my time, I am not bound to accept the trust; I may do it or not as I please; but if I do accept and give bond and take the oath, I must do it without compensation. The giving the bond and taking oath is as much voluntary as the accepting the trust. Apart from the statute, neither an executor or administrator would be entitled to any compensation, though they give bond. (*Wms. Ex'rs.*) Being voluntary trustees without stipulation for compensation, they are entitled to none. That is the law in England; in New York; in Delaware.

My answer to the cases cited on the other side is 1st. They were officers of the U. States bound to obey their superior, and ordered by their superior to do services not within their office. In M'Daniel's case the judge says he had no discretion, but was bound to obey the

order of the head of his department. So in the other cases. 2d. The right of setting up a claim for compensation for extra services accrued from and was given by an act of Congress of 1797. (*Gordon's Dig.* 50.) Before then they had no such right. (6 *Wh. Rep.* 135, *U. S. Wilkins;* 9 *Ibid* 651.)

2d. The amount of service. It is not my duty to undervalue the services rendered. However great they may have been, they were *voluntary :* undertaken for the benefit of the institution which the defendants represented, and the State, of which they were distinguished citizens; voluntarily assumed for great public benefits, without any stipulation for, or idea of compensation to the trustees or managers.

This argument was had at the June Term, 1844, before the Chancellor, and Judges Harrington, Layton and Milligan. Judge Layton resigned before judgment; and the case was at the next term submitted on the previous argument to the Chancellor and Judges Harrington, Milligan and Hazzard.

The Chancellor pronounced the opinion of the court; Judge Hazzard dissenting.

JOHNS, JR., *Chancellor.*—The legal question in this case submitted *to our consideration is, whether the defendants* have a right to retain out of the money received by them from the purchasers of the lottery scheme, any and what sum as their compensation; the expenses actually incurred having been paid.

The lottery act for the benefit of Delaware College and other purposes, authorized the persons thereinafter appointed managers, to institute, carry on and draw a lottery in one or more classes, for raising a sum of money not exceeding $100,000, clear of all expenses; and the said sum when so raised, was declared by the act to be applicable in the following manner, namely: $50,000 thereof for the use and benefit of Delaware College, and $25,000 thereof for the use of " the fund for establishing schools in the State of Delaware, and $25,000 thereof to be paid into the treasury of the State, for the use of the State."

The second section appointed the managers, and provided that the said managers, or a majority of them, before entering upon the duties required of them by the act, should give separate bonds to the State of Delaware, each in the sum of $10,000, conditioned for the faithful discharge of the trust reposed in them by the several provisions of the act; and that those only of the persons named should

be managers of the said lottery, who should give bonds as above required.

The third section provided for the drawing of the lottery by the managers, and payment of prizes.

The fourth section enacted, that if the said managers shall deem it expedient for effecting the objects of the act, to sell or dispose of the scheme of the said lottery, or of any class or classes thereof, to any person or persons residing out of this State, it shall and may be lawful for the managers so to do: *Provided,* the said managers shall take from the person or persons to whom they may sell or dispose of the scheme of the said lottery, or of any class or classes thereof, a bond to the State of Delaware in such penal sum and with such surety as the governor of the State shall approve, conditioned for the faithful discharge of the trust that may be thus reposed in such person or persons; and in case bond and security be so taken and approved, the said managers shall be exonerated from all liability on account of the person or persons to whom they may so sell or dispose of said scheme, class or classes of said lottery.

The sixth section, provided that all money raised by virtue of the act should be applied to the objects and uses aforesaid; and that the said money " shall be paid over by the said managers."·

The seventh enacted, that the act should continue and be in force for ten years from its passage and no longer.

The managers who gave bond as required by the act, and accepted thereby the appointment, proceeded to carry into effect the provisions of the lottery act. Not deeming it expedient themselves to institute, carry on and draw the lottery, they adopted the mode prescribed by the fourth section, and made sale of one-fifteenth part of the sum authorized to be raised, to Yates & McIntyre, clear of all deductions and expenses for eight calendar months, from the 13th of April, to the 31st of December, 1835, both days inclusive, for the sum of $6,666 66; and to Dudley S. Gregory fourteen-fifteenth parts of said sum for nine years, one calendar month and ten days, from January 1st, 1836, to February 10th, 1845, both days inclusive, for the sum of $73,333 34, clear of all deductions and expenses. By the terms of the contract expressly providing, and the purchasers agreeing, from time to time well and truly to pay, discharge and satisfy all expenses, costs and charges whatsoever, attending the drawing of each and every class of the said lottery during their seve·ral and respective terms aforesaid; and shall and will take upon themselves and pay, bear and sustain all risks, hazards, losses and ex-

penses whatsoever, attending the drawing of each and every class of said lottery, with tickets on hand unsold or otherwise, or in any other manner whatsoever arising out of or attending the instituting, drawing, or carrying on the said lottery, or any class or classes thereof. Bonds and security as prescribed by the act were by the contractors executed, approved, and deposited with the State treasurer.

From this brief statement of the case, it is apparent all expenses incident to the instituting, carrying on and drawing of the lottery were fully provided for in the contract of sale; and therefore the money received by the managers is in their hands, clear of all expense that accrued by instituting, carrying on and drawing the said lottery. It represents the value of the grant exclusive of all expense. We thus arrive at the simple question, whether it belongs to the parties, severally, for whose use and benefit the lottery act was passed, or is subject to deduction on account of any claim made by the managers for compensation.

It is not a claim founded on actual expense we are called upon to consider, nor that either in law or equity can be entitled to that character. But for the purpose of arriving at a proper conclusion as to the legal right of the managers to retain, it may be well to ascertain their relative position under the act. From the manner of their appointment it is evident the act left the acceptance thereof conditional, and altogether voluntary; and by express and clear language defines the duty to be discharged under and according to its provisions to be a trust. Hence we cannot disregard the explicit and unequivocal declaration contained in the act itself, and therefore feel bound to regard the persons appointed managers as trustees; and, inasmuch as their acceptance by executing bonds was optional, and they chose to do it, they are therefore voluntary trustees.

Having thus ascertained the character of the persons appointed, and that of the duty to be discharged, it becomes necessary to consider and inquire whether the lottery act will warrant us in sustaining their claim to compensation, for receiving and paying over the sum paid them by the contractors. Unless the claim can be supported under the first section, it does not appear to be sanctioned in any other part of the act. The first section contemplates the raising of the sum therein mentioned, by instituting carrying on and drawing the lottery, and provides for the payment of all expenses. The contract of sale, transferring this power from the managers to the contractors, has conferred upon them full authority, over and above

the sum of $100,000, to reimburse themselves all expenses.   Hence it is manifest, the managers by their own act, have conferred all the power contained in that section of the act, designed by the legislature to provide for the payment of expenses.   The whole time having been sold, it has been exhausted.   But it may be said the words of the section being " a sum not exceeding $100,000 clear of all expenses," that the managers have a right to deduct from the sum received by them, inasmuch as the limitation is upon the amount beyond which they could not go, and does not fix any sum certain as a minimum.   This mode of expression in the first section was no doubt adopted to authorize the payment out of the sum raised, of all expenses which should accrue or be incurred by the managers in the legitimate exercise of the power granted.   But can it be that in authorizing payment of the expenses of the lottery, it was the intention under the expression, " all expenses," to provide for an allowance of compensation to the managers.   It would seem that such an allowance not being understood according to the common acceptation of the word as included or embraced by it, ought to have been expressly provided for; especially, when the service to be compensated required some rule of adjustment, and ought to have been settled by some mode of estimating the value thereof, either as a salary or a commission upon the amount received and paid over.   The expenses or expenditure on account of the lottery, was a matter that could with propriety be left to the managers to adjust, settle and pay, since they could have no interest in increasing the amount so applied.   But if under the authority to pay expenses, they should be allowed to compensate themselves, it is apparent they are constituted their own paymasters, and become the judges of, and estimate the value of their own services, not on the principle of reimbursement for what they have expended, but as compensation for services rendered by them as trustees.   We may from such a result perceive the propriety of the rule which precludes a trustee from compensation, unless settled by the deed of trust, although he is entitled to be reimbursed all expenses; and, it is further apparent, there is good reason for preserving the distinction between expenses and compensation. In remarking upon the rule, and the distinction, Chancellor Kent, in the case of Green *vs.* Winter, 1 *Johns. Cha.* 27, observes, nothing can be stronger or more explicit, than the uniform language of the English Court of Chancery upon this point, and even if he was free from the weight of authority, he should hesitate greatly before he undertook to question the wisdom or the policy of the rule.

It has been urged in the argument of this case, with a view to obviate the effect of this rule relative to compensation, that the general policy and universal practice and usage of the State, and every branch of the government, has been to allow compensation for services rendered without any express or previous stipulation. This ground relies upon the practice and usage, and must therefore, be considered independent of the lottery act. The existence of any such policy, general practice or usage, has not been made to appear by any thing presented in this case, or that has occurred within the range of our observation. The two lottery acts referred to in support of the position assumed, appear to recognize a contrary policy, practice and usage, inasmuch, as without the express provision, it may be said the allowance could not have been made. The acts referred to are two, the first, that of 1789, authorizing a lottery to raise a fund for building piers in the river Delaware; and the second, an act for the benefit of Sussex county. These acts respectively imposed upon the managers the additional service or duty, after they had raised and received the money, of disbursing it; the former, in building the piers; and the latter, in constructing the public buildings; the compensation being made expressly on account of the extra labor and service in applying the fund, in executing the objects of the grant; and limited accordingly, in the first case, by a per centage on the amount disbursed; and in the last, by the determination of the Levy Court of Sussex county, authorizing only such an allowance as that court, on adjusting the accounts, should deem proper. From the special provision upon the subject of disbursements as contained in the two acts referred to, making an allowance for special service, when none is provided for the receipt and payment over of the general fund, we consider nothing can be deduced that would warrant us in recognizing the existence of any such general practice or usage sanctioning compensation to lottery managers independent of express grant.

Another ground relied on in the argument of this case would sustain the claim as legally due to the defendants, in consequence of their holding the appointment officially, and not in the character of trustees; and in support of this view of the case, our attention has been directed to the decisions in favor of claims made by officers of the United States, for compensation on account of extra services. Supposing the defendants to occupy an official station, the reason in favor of extra allowance to the subordinate officers in the United States, performing extra service in obedience to the orders of their

superiors, does not apply; and therefore, those decisions cannot be considered applicable or entitled to any influence in determining the question submitted to our consideration. But independently of the principle established by those decisions, we apprehend the defendants cannot claim as occupying an official character; for the eighth section of the third article of the Constitution of Delaware, provides: That the governor shall appoint all officers whose offices are established by the Constitution, *or by law;* and whose appointments are not therein otherwise provided for. The lottery act we are considering makes the appointments originally, and only authorizes the executive to substitute or supply vacancies. Hence we cannot recognize the defendants as entitled officially—therefore, it necessarily follows they must be regarded as agents; to whom, by a legislative act, power has been delegated, and that power, being confided to their action for the benefit of others, constitutes them on acceptance thereof to all intents and purposes trustees.

The court ordered a certificate to the Superior Court, that the defendants were not entitled to any sum as *compensation,* but that there was due to the legal representatives of the late James R. Black, deceased, the sum of one hundred dollars for *expenses ;* and also the sum of one hundred dollars to the defendant James Rogers, ascertained and allowed by the court, under the special agreement in this cause; and upon this principle, the amount appearing due from the defendant, James Rogers, on the 10th of June, 1842, was $3,100; and with interest to the 10th of. June, 1845, $3,658 ; and the amount due from the defendant George Platt, on the 10th of June, 1845, $1,652; for which sums and the costs, judgment was directed against the defendants, severally.

*Gilpin,* Attorney General, and *Ridgely,* for the State.
*Wales* and *Rogers, jr.,* for defendants.